[924 NE2d 336, 897 NYS2d 382]

In the Matter of City of New York et al., Appellants, v Patrolmen's Benevolent Association of the City of New York, Inc., et al., Defendants, and Sergeants' Benevolent Association of the City of New York et al., Respondents.

Argued November 18, 2009; decided December 17, 2009

**POINTS OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel,* New York City (*Julian L. Kalkstein* and *Larry A. Sonnenshein* of counsel), for appellants. The New York City Charter and Administrative Code grant the New York City Police Department Commissioner full disciplinary authority of the department. Therefore the Commissioner has full authority to both institute hair drug testing procedures to uncover individual or systemic corruption and to investigate accusations of malfeasance. The City Board of Collective Bargaining erred when it determined that the Commissioner's disciplinary authority was limited and he was required to engage in collective bargaining before instituting drug testing by hair in order to maintain the discipline and good order of the department. (*Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc. v New York State Pub. Empl. Relations Bd.,* 13 AD3d 879, 6 NY3d 563; *People ex rel. Masterson v French,* 110 NY 494; *Matter of De Boer v Looney,* 60 Misc 2d 673; *Matter of DiLauria v Police Commrs. of Town of Harrison,* 285 AD2d 464; *Matter of Gamma v City of Newburgh,* 277 AD2d 236; *Kelley v Johnson,* 425 US 238; *Matter of City of New York v Uniformed Fire Officers Assn., Local 854, IAFF, AFL-CIO,* 95 NY2d 273;

*Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County,* 34 NY2d 222; *Matter of City of Watertown v State of N.Y. Pub. Empl. Relations Bd.,* 95 NY2d 73; *Matter of City of Mount Vernon v Cuevas,* 289 AD2d 674.)

*Steven D. DeCosta, General Counsel, Office of Collective Bargaining,* New York City (*John F. Wirenius* of counsel), for New York City Office of Collective Bargaining and another, respondents. I. The City of New York's fatally late and fatally flawed new evidence and new theories of the case are not properly before the Court. (*Matter of Chaplin v New York City Dept. of Educ.,* 48 AD3d 226; *Wilson v Galicia Contr. & Restoration Corp.,* 10 NY3d 827; *Bingham v New York City Tr. Auth.,* 99 NY2d 355; *Lichtman v Grossbard,* 73 NY2d 792; *Matter of County of Erie v State of N.Y. Pub. Empl. Relations Bd.,* 12 NY3d 72; *Matter of City of New York v Uniformed Fire Officers Assn., Local 854, IAFF, AFL-CIO,* 95 NY2d 273; *People v Rossi,* 70 AD2d 575; *Livoti v Mallon,* 92 AD2d 532; *W.G. & Assoc., LLC v A. Aleem Constr., Inc.,* 33 AD3d 387; *DeSoignies v Cornasesk House Tenants' Corp.,* 21 AD3d 715.) II. The Appellate Division properly interpreted the Civil Service Law, the New York City Charter and Administrative Code to reach a result consistent with this Court's prior holdings, especially *Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc. v New York State Pub. Empl. Relations Bd.* (6 NY3d 563 [2006]). (*Matter of County of Chautauqua v Civil Serv. Empls. Assn., Local 1000, AFSCME, AFL-CIO, County of Chautauqua Unit 6300, Chautauqua County Local 807,* 8 NY3d 513; *Matter of Board of Educ. of Yonkers City School Dist. v Yonkers Fedn. of Teachers,* 40 NY2d 268; *Matter of City of Long Beach v Civil Serv. Empls. Assn., Inc.—Long Beach Unit,* 8 NY3d 465; *Horn v New York Times,* 100 NY2d 85; *Wieder v Skala,* 80 NY2d 628; *People ex rel. Masterson v French,* 110 NY 494; *Matter of Von Essen v New York City Civ. Serv. Commn.,* 4 NY3d 220; *Matter of City of Mount Vernon v Cuevas,* 289 AD2d 674; *Matter of Montella v Bratton,* 93 NY2d 424; *Matter of Lynch v Giuliani,* 301 AD2d 351.)

*Certilman Balin Adler & Hyman, LLP,* East Meadow (*Candace Reid Gladston, Michael C. Axelrod* and *Donna-Marie Korth* of counsel), for Sergeants' Benevolent Association of the City of New York, Inc., and others, respondents. *Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc. v New York State Pub. Empl. Relations Bd.* (6 NY3d 563 [2006]) does not foreclose

bargaining over prophylactic random drug testing procedures. (*Matter of Montella v Bratton,* 93 NY2d 424; *Matter of City of New York v MacDonald,* 201 AD2d 258; *Matter of Scornavacca v Leary,* 38 NY2d 583; *Police Benevolent Assn. of N.Y. State Troopers, Inc. v Division of N.Y. State Police,* 11 NY3d 96; *Matter of City of Watertown v State of N.Y. Pub. Empl. Relations Bd.,* 95 NY2d 73; *Matter of Cohoes City School Dist. v Cohoes Teachers Assn.,* 40 NY2d 774; *People ex rel. Masterson v French,* 110 NY 494; *People ex rel. Hogan v French,* 119 NY 493; *Matter of City of New York v Uniformed Fire Officers Assn., Local 854, IAFF, AFL-CIO,* 95 NY2d 273; *Matter of County of Erie v State of N.Y. Pub. Empl. Relations Bd.,* 12 NY3d 72.)

**OPINION OF THE COURT**

READ, J.

In January 2005, the New York City Police Department (NYPD) informed representatives of various police unions, including the Detectives Endowment Association (DEA), Patrolmen's Benevolent Association (PBA), Sergeants' Benevolent Association (SBA), and Captains Endowment Association (CEA) (collectively, the unions), that it intended to use a methodology for hair testing known as radioimmunoassay (hereafter, RIAH or hair analysis) for all drug screening of uniformed members, beginning the following summer. The unions protested that this decision was subject to collective bargaining. We disagree: the Police Commissioner's disciplinary authority over the NYPD vests him with discretion to choose the scientific methodology to be used for drug testing, and the circumstances prompting testing; i.e., so-called testing triggers.

I.

At the time this dispute began to take shape, drug testing of uniformed members was governed by several Patrol Guide Procedures (PGP), effective January 1, 2000, two of which called for checking either urine or hair samples. Specifically, PGP No. 205-30 specified testing either the urine or hair of members reasonably suspected of illegal drug use; and PGP No. 205-35, which allowed members subject to unsubstantiated allegations of illegal drug use to request voluntary testing, provided for testing of either hair or urine samples. In addition, all probationary NYPD members received an end-of-probation medical examination, which included drug testing of hair samples. RIAH was the methodology used for hair testing.

PGP No. 205-29 addressed random drug testing, whereby an automated database was used to select uniformed members who

were directed to appear at a specified time and date for testing. While this PGP did not identify urine analysis as the testing methodology, it incorporated a number of steps specific to urine testing. Four other PGPs similarly did not actually identify the method of drug testing, but referred only to the collection of urine samples: PGP No. 205-32 (covering members applying for and assigned to the Organized Crime Control Bureau); PGP Nos. 205-31 and 205-33 (covering members applying for assignment to designated specialized units); and PGP No. 205-34 (covering members applying for discretionary promotions).

Representatives of the City of New York and the unions met several times to discuss the NYPD's plan to phase out urine analysis in favor of RIAH. At the first meeting, held on January 7, 2005 at the New York City Office of Labor Relations, the City explained that there would be no change to existing NYPD policies regarding drug testing triggers, due process protection, and disciplinary consequences; the only modification of existing policies was the switch from urine analysis for most drug testing to RIAH for all drug testing. At a second meeting with the City on February 15, 2005, the unions asked questions and voiced concerns, and the City provided additional information about hair analysis.

By letter to the New York City Commissioner of Labor Relations, dated April 21, 2005, the unions requested an additional meeting "to continue our collective bargaining[1] to discuss our concerns regarding hair follicle testing which the [NYPD] intends to implement over the summer." On April 27, 2005, the Commissioner sent the unions a copy of a planned Finest Message from the NYPD's Chief of Personnel, addressed to all commands. The cover letter identified the Finest Message as "the Police Department's drug testing policy regarding the use of hair analysis," and stated that "[a]s previously discussed, the City is providing you with a copy of this policy in advance of its August 1, 2005 implementation."

The subject of the enclosed Finest Message was "Expanding the Use of Hair Analysis as a Means of Drug Screening Uniformed Members of the Service." It began by explaining that effective August 1, 2005, the NYPD would

"expand the use of hair analysis as a means of drug screening uniformed members of the service.

---

1. The City characterized its discussions with the unions as "information sharing," not collective bargaining.

Beginning on that date, the [NYPD] will use hair analysis in lieu of the current practice of using urine analysis to conduct random drug screening as well as for promotional drug screening. Hair analysis drug screening will also be used for uniformed members applying for assignment to designated specialized units."

The Finest Message set out the protocol for collecting hair samples, and gave an assurance that appropriate chain-of-custody procedures would be followed; asserted that the NYPD had used hair analysis when testing for cause and at the end of probation since May 1995 and February 1996 respectively; and provided the following rationale for the changeover from urine analysis in most cases to RIAH in all cases:

"Hair analysis provides a window of detection of approximately ninety (90) days, compared with a relatively shorter window with urine analysis, and thereby provides a more effective method of detection. In addition, hair analysis cannot be evaded in the same fashion as urine analysis, where drug users can attempt to substitute clean specimens, or merely abstain from drug use for a few days, and pass the screening test. Furthermore, drug residues remain permanently embedded in the hair—they cannot be washed or bleached out."

Finally, the Finest Message suspended any conflicting provisions of the NYPD's manual or other directives.

Letters in the record from the Deputy Commissioner of the NYPD to the unions, dated June 6, 2005, indicate that City and union representatives met on June 1, 2005 to discuss further "the NYPD's planned implementation of Hair Testing for [its] random drug screening program" and, according to the City, to address each of the unions' outstanding concerns. These letters included as an enclosure a list of laboratories approved by the New York State Department of Health to conduct hair analysis "for reference only and pursuant to discussions at [the June 1st] meeting." On August 1, 2005, the NYPD issued the same Finest Message supplied to the unions on April 27th.

On August 26, 2005, the DEA filed an improper practice petition on behalf of itself, the PBA and the SBA to commence proceedings before the Board of Collective Bargaining (the Board), a constituent body of the New York City Office of Collective Bargaining (OCB) (*see* New York City Collective

Bargaining Law [NYCCBL] [Administrative Code of City of NY] § 12-306; Rules of NY City Office of Collective Bargaining [61 RCNY] §§ 1-07, 1-12). This petition generally alleged that the NYPD violated NYCCBL § 12-306 (a) (4) by unilaterally changing its policy regarding drug testing.[2] The CEA filed an improper practice petition on November 7, 2005, which is described in the record as essentially identical to the earlier DEA petition.

The CEA alleged in its petition[3] that the "procedures used by the [NYPD] in implementing a decision to conduct drug testing on employees [were] mandatory subjects of bargaining." The CEA petition does not define what the word "procedures" is meant to encompass, but refers to " 'testing methodology, choice of laboratory, collection procedures, chain of custody, sample screening, conditions for retesting, and reporting and recording of test results' " (quoting *Matter of District Council 37, AF-SCME, AFL-CIO [New York City Emergency Med. Serv. of N.Y. City Health & Hosps. Corp.]*, 57 OCB 16 [BCB 1996] [Decision No. B-16-96], at 15 [following *Matter of Nassau County Police Benevolent Assn. (County of Nassau)*, 27 PERB ¶ 3054 (1994)]). The singular thrust of the CEA petition is that the NYPD engaged in an improper practice by "using RIAH exclusively in lieu of urine analysis to conduct random drug screening," and/or "implementing . . . an expansion of RIAH testing"—i.e., by unilaterally changing the methodology for drug testing employees who were not under any suspicion of wrongdoing.[4]

In its answer to the CEA petition, the City responded generally that there had been no change in its long-standing "procedures" for hair testing, and that the "decision to expand hair testing primarily involve[d] a basic goal or mission of the employer." As was the case with the CEA petition itself, what the City meant by "procedures" is not entirely clear, although the City also seems to have considered this word to embrace testing methodology. In sum, the City contended that it had not unilaterally modified a term or condition of employment because the NYPD already used RIAH for drug testing, and other

---

2. NYCCBL § 12-306 (a) (4) states that it is an improper practice for a public employer "to refuse to bargain collectively in good faith on matters within the scope of collective bargaining with certified or designated representatives of its public employees."

3. The record includes a copy of only the CEA petition.

4. The only other unilateral change that the NYPD was ever alleged to have made was its designation in early 2006 of a different laboratory to perform RIAH testing of hair samples. The CEA brought up this issue in its reply to the City's answer to its petition.

procedures employed for hair testing remained the same after August 1, 2005 as they had been before that date. That is, the City did not dispute that a change in drug testing procedures (however "procedures" might be defined) would give rise to an obligation to bargain with the unions; the City simply argued that there had been no change.

After the record closed in the proceedings before the Board, we issued our decision in *Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc. v New York State Pub. Empl. Relations Bd.* (6 NY3d 563 [2006] [*PBA v PERB*]). In that case, we held that police discipline in New York City "may not be a subject of collective bargaining under the Taylor Law" because New York City Charter § 434 (a) and New York City Administrative Code § 14-115 (a) "expressly commit[ ] disciplinary authority over [the] police department to local officials" (*id.* at 570). The Board asked the parties to submit written statements to explain their respective positions on the applicability and impact, if any, of our decision.

In response, the unions took the position that *PBA v PERB* did not affect the duty to bargain over drug testing procedures because they "[were] not disciplinary procedures," and "[did] not form the basis for discipline. Rather, the results of the tests, not the procedures, may form the basis for discipline." The City countered that *PBA v PERB* foreclosed collective bargaining because "[t]esting procedures, testing triggers and disciplinary consequences [were] inextricably intertwined, at least in this situation, with the Police Commissioner's disciplinary authority" under New York City Charter § 434 (a) and New York City Administrative Code § 14-115 (a). In short, the City now contended that drug testing procedures generally were disciplinary matters outside the purview of collective bargaining.

On December 4, 2006, the Board granted both petitions because it found that "even if [the] NYPD's procedures for hair testing [were] the same [before and after August 1, 2005], *the expansion of the categories* of employees to whom the procedures now [were] applied constitute[d] a unilateral change in drug screening procedures" (*Matter of Detectives Endowment Assn. [City of New York],* 77 OCB 37 [BCB 2006] [Decision No. B-37-2006], at 16 [emphasis added]).[5] Similarly, the Board characterized the issue before it as "whether [the] NYPD's adoption of

---

5. This opinion generally refers to the Board's majority opinion in the DEA case only. The Board's reasoning in the CEA decision was the same as in

RIAH (hair) testing as the prescribed mechanism of drug screening under circumstances in which, prior to August 1, 2005, [the] NYPD tested only urine, constitute[d] a unilateral change in a mandatory subject of bargaining," and concluded that it did (*id.* at 12). That is, the Board decided that an expansion of categories subject to testing (i.e., the adoption of additional testing triggers) and a change in testing methodology were subject to collective bargaining.

In reaching these conclusions, the Board relied on *County of Nassau (supra)*, the "leading decision" of the New York State Public Employment Relations Board (PERB) on the topic of drug testing (*id.*). In *County of Nassau*, PERB opined that there was a "clear distinction between an employer's decision to drug test employees and the procedures used to implement that decision, including the consequences of the testing." As a result of this "clear distinction," PERB held that an employer's choice to conduct drug testing might not be a mandatory subject of bargaining,[6] but that the procedures to implement that choice most certainly were. Further, PERB classified both the particular scientific methodology to be utilized for drug testing and testing triggers as "procedures."[7]

Finally, the Board was not persuaded that our decision in *PBA v PERB* called for a different outcome. As the Board put it,

the DEA case. The Board did, however, address an additional question in the CEA case—i.e., "whether a change in testing laboratory [was] encompassed within mandatorily bargainable drug testing procedures" (*Matter of Captains Endowment Assn. [City of New York]*, 77 OCB 38 [BCB 2006] [Decision No. B-38-2006], at 10; *see also* n 4, *supra*). The Board decided that it was. As noted later, the CEA has withdrawn from this litigation (*see* n 9, *infra*).

6.   While pointing out the "clear distinction" between the decision to test and procedures to implement such a decision, PERB did not express an opinion in *County of Nassau* about the negotiability of the former because it was not an issue in the case. Thus, PERB *assumed* for purposes of its analysis that a public employer's decision to test employees for drugs was not mandatorily negotiable. In discussing its own prior decisions in this case, though, OCB seems to accept the proposition that the public employer's decision to test employees for drugs is not subject to collective bargaining. But, as was the situation in *County of Nassau*, the Police Commissioner's decision at this level of generality was never an issue in this case.

7.   In *County of Nassau*, PERB identified the following as "several separate implementation decisions" or "procedures used to implement" a public employer's decision to drug test employees: "*testing methodology, testing triggers (e.g., definition of reasonable suspicion)*, choice of laboratory, collection procedures, chain of custody, sample screening, conditions for retesting, reporting and recording of test results, due process protections, and disciplinary consequences" (emphasis added).

"[t]he procedural matters raised by the Unions, specifically, testing methodology, choice of laboratory, collection procedures, chain of custody, sample screening, conditions for re-testing, and reporting and recording of test results, are not implicit parts of the disciplinary process. As the Unions point out, the procedures for drug testing are utilized before any basis for discipline is determined by the Commissioner to exist . . . [T]he decision to conduct drug testing, like the decision to impose discipline, is a management right . . . not subject to bargaining; but . . . , unlike the matter of discipline, there is no statutory or policy basis to remove the procedures by which drug testing is to be conducted from within the scope of mandatory collective bargaining" (77 OCB 37, at 20).

There was a dissent to the Board's decision on dual grounds:[8] that the NYPD had not materially changed its drug testing procedures; and that the Board's decision was "fundamentally irreconcilable" with *PBA v PERB* (*Matter of Captains Endowment Assn.*, dissenting op at 3). As for the former ground, the dissent noted that all NYPD uniformed members were already subject to hair testing, because that method had been used for end-of-probation, reasonable suspicion and voluntary drug screening. As a result, "[a]ll that ha[d] changed [was] the relative frequency with which the NYPD use[d] hair testing as opposed to urine testing, where the employees were already subject to testing with both procedures and where the procedures themselves were already well-established" (*id.* at 2).

Next, the dissent observed that *County of Nassau* and its progeny, which were cited by the Board to support its decision, all predated *PBA v PERB* and, in the case of the Board's prior decisions, did not address the Police Commissioner's responsibility for discipline. As a result, it was

"questionable . . . whether the distinction they purport[ed] to find between a decision to test for drugs (not mandatory) and the procedure to be utilized to test for drugs (mandatory) could now be

8. The Board is made up of two city representatives, two union representatives, and three impartial members. Both city representatives dissented in the CEA case. One of the city representatives recused himself in the DEA matter; the other city member dissented there, too, for the reasons set out in his dissent in the CEA case.

sustained in those jurisdictions such [as] the City of New York which have a special or local law relating to police discipline" (*id.* at 4).

The dissent further pointed out that, with respect to *PBA v PERB*,

"[a]mong the proposals held to be prohibited subjects of bargaining . . . were proposals that concerned the conduct of departmental investigations of possible misconduct. These investigatory procedures [were] necessarily utilized before the Commissioner determine[d] that there [was] any basis for discipline . . . Similarly, the Commissioner's random drug tests are [to be] conducted for the purpose of investigating the possible misconduct of officer use of an illicit drug . . . The investigatory procedures utilized—whether interrogation procedures or biochemical assays—are an element of the Commissioner's disciplinary decisions, and as such, under [*PBA v PERB*], are not proper subjects of bargaining" (*id.* at 5).

The dissent concluded by observing that the City had, for years, maintained two drug testing procedures (RIAH and urine analysis), applicable to all of the employees represented by the unions; thus, "[t]he decision to shift from predominant use of one test to predominant use of the other plainly [did] not constitute a material change in terms or conditions of employment, and it [was] clearly an exercise of the Commissioner's authority over discipline" (*id.* at 6).

In January 2007, the City brought this CPLR article 78 proceeding to annul the Board's decisions. In its petition, the City emphasized that hair testing is the most effective method for ferreting out illegal drug use, and that its hair testing procedures were "as related to the disciplinary process as were the investigatory interviews the Court of Appeals in [*PBA v PERB*] found to be prohibited collective bargaining subjects." The City also again contended that it had not changed terms and conditions of employment because the complained-of procedures were identical to those already in effect in numerous contexts.

In a decision dated December 5, 2007, Supreme Court granted the City's petition, annulled the Board's decisions, and denied

OCB's cross motion to dismiss the City's petition.[9] According to the court, the unions, in line with *County of Nassau*, argued that

> "while the Police Commissioner's disciplinary authority over the police force included the right to screen officers for drug use, the expanded use of a particular testing method such as RIAH, along with the implementation of different procedures to administer the test, altered the terms and conditions of the represented officers' employment."

The court disagreed, reasoning that "requiring that drug screening methodologies and practices be submitted to collective bargaining seriously limits the Commissioner's ability to effectively enforce discipline within the New York City Police Department."

On October 16, 2008, the Appellate Division reversed Supreme Court's judgment on the law; reinstated the Board's decision; denied the City's petition; and dismissed the proceeding.[10] The court reasoned that the expanded use of hair testing "does not implicate the Police Commissioner's discretion to conduct an investigation into an alleged infraction by a member of the force, a prerogative that arises *only after written charges have been preferred*" (*Matter of City of New York v Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 56 AD3d 70, 76 [1st Dept 2008] [emphasis added]). The Appellate Division concluded that "no persuasive policy reason ha[d] been advanced to require [OCB] to depart from its prior decisions, which . . . consistently found that routine drug screening procedures are a mandatory subject of collective bargaining" (*id.* at 71). We subsequently granted leave to appeal (12 NY3d 707 [2009]), and now reverse.

## II.

The Taylor Law requires public employers to collectively bargain over "terms and conditions of employment of the public employees" (Civil Service Law § 204 [2]).[11] We have long recognized the "strong and sweeping policy of the State to

---

9. Prior to Supreme Court's decision, the CEA withdrew its opposition to the City's position in this litigation.

10. The PBA withdrew its appeal prior to the Appellate Division's decision in this case.

11. The Taylor Law allows localities to establish substantially equivalent provisions and procedures, to be administered by a local version of PERB, or a mini-PERB, such as OCB (Civil Service Law § 212). Consistent with the Taylor

support collective bargaining under the Taylor Law" (*Matter of Cohoes City School Dist. v Cohoes Teachers Assn.*, 40 NY2d 774, 778 [1976]). There exists a "presumption . . . that all terms and conditions of employment are subject to mandatory bargaining" (*Matter of City of Watertown v State of N.Y. Pub. Empl. Relations Bd.*, 95 NY2d 73, 79 [2000]). Nonetheless, "some subjects are excluded from collective bargaining as a matter of policy, even where no statute explicitly says so" (*PBA v PERB*, 6 NY3d at 572). In *PBA v PERB*, we concluded that New York City Charter § 434 (a) and Administrative Code of the City of New York § 14-115 (a),[12] originally enacted as state statutes, "state the policy favoring management authority over police disciplinary matters in clear terms" and "express a policy so important that the policy favoring collective bargaining should give way" (*id.* at 576).[13]

The DEA and the SBA, the two unions remaining in this litigation, essentially ask us to endorse *County of Nassau* and to opine generally that the Police Commissioner's decision to drug test uniformed officers is a managerial prerogative, but the "procedures" to implement his decision are mandatorily negotiable. There are two problems with this approach. First, the Police Commissioner's authority under New York City Charter § 434 (a) and Administrative Code § 14-115 (a) was not implicated in *County of Nassau*; second, the only "procedures" that the DEA and SBA challenged or the Board addressed in this case were testing methodology and testing triggers. The record admits no possibility of misunderstanding on this score, as the detailed discussion of it in Part I illustrates. Specifically, the narrow issue decided by the Board, and therefore the only issue properly before us for review, is "whether [the] NYPD's adoption of RIAH (hair) testing as the prescribed mechanism of drug screening under circumstances in which, prior to August 1, 2005, [the] NYPD tested only urine, constitute[d] a unilateral

---

Law, the New York City Collective Bargaining Law contains a requirement similar to Civil Service Law § 204 (2) (*see* NYCCBL § 12-307 [a]).

**12.** Section 434 (a) provides that "[t]he [police] commissioner shall have cognizance and control of the . . . discipline of the department, and of the police force of the department"; section 14-115 (a) specifies that, in cases of police misconduct, "[t]he [police] commissioner shall have power, in his or her discretion, . . . to punish the offending party."

**13.** We noted that "where Civil Service Law §§ 75 and 76 apply, police discipline may be the subject of collective bargaining" (*PBA v PERB*, 6 NY3d at 573); however, New York City Charter § 434 (a) and Administrative Code § 14-115 (a) were grandfathered pursuant to Civil Service Law § 76 (4).

change in a mandatory subject of bargaining" (*Matter of Detectives Endowment Assn., supra* at 12). In light of our decision in *PBA v PERB*, we conclude that it does not.

The Police Commissioner's disciplinary authority under sections 434 (a) and 14-115 (a) is not limited to the formal disciplinary process; i.e., situations where allegations of misconduct have been made or are being adjudicated against identified officers. Our decision in *PBA v PERB* did not say this. Indeed, two of the five subjects covered by the expired collective bargaining agreement at issue in *PBA v PERB*—the length of time a police officer could confer with counsel before being questioned in a departmental investigation and guidelines for interrogation of police officers—preceded the lodging of any charges.

Moreover, the detection and deterrence of wrongdoing within the NYPD—particularly crimes, such as illegal drug use—is a crucial component of the Police Commissioner's responsibility to maintain discipline within the force. And both the Board and the unions concede that the Commissioner may unilaterally institute drug testing of uniformed officers. They would, however, check his discretion to select the investigatory measures that he deems most effective to discover and deter illegal drug use by requiring collective bargaining over testing methodology and testing triggers. In our view, however, these subjects are inextricably intertwined with the Commissioner's authority to conduct drug testing in the first place; they are not ancillary or tangential to his disciplinary authority. As Supreme Court put it

> "if the Commissioner is not at liberty to use a particular drug test even after determining that [it] would be more effective at exposing drug use among police officers, then his ability to carry out his disciplinary 'authority' has been significantly limited. Similarly, decisions about when and where to use such a test—especially in the area of random testing—ha[ve] an obvious bearing [on] how effective efforts to detect drug use will ultimately be."

Finally, we emphasize that we are answering only the discrete question posed in this case: whether drug testing methodology and testing triggers are encompassed within the Police Commissioner's disciplinary authority and therefore are excluded from collective bargaining as a matter of policy. We are not saying that every step that the Commissioner takes or every decision

that he makes to implement drug testing is excluded from bargaining. The full extent or the limits of his unilateral disciplinary authority in the context of drug testing are simply not presented on this record.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the judgment of Supreme Court reinstated.

Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur; Chief Judge LIPPMAN taking no part.

Order reversed, etc.